IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

MARTA T. LILLY,                    }
                                   }
        Plaintiff,                 }
                                   }      CIVIL ACTION NO.
v.                                 }      09-AR-0169-S
                                   }
CHARTER COMMUNICATIONS,            }
                                   }
        Defendant.                 }

**MEMORANDUM OPINION**

Before the court is the motion (Doc. 28)[1] of defendant, Charter Communications ("Charter"), for summary judgment as to all claims brought by plaintiff, Marta T. Lilly ("Lilly").  Lilly, a former Charter employee, brings two claims under the Family and Medical Leave Act of 1993, 29 U.S.C. § 2601 *et seq* ("FMLA"): (1) retaliatory termination; and (2) retaliatory failure to rehire. Also pending is Charter's motion to strike (Doc. 34) portions of Lilly's evidentiary submission in the form of an affidavit.  For the reasons that follow, Charter's motion to strike will be granted in part.  Charter's motion for summary judgment will be granted in its entirety.

**FACTS**

Because of the procedural posture, all arguably admissible evidence is considered in the light most favorable to Lilly.  All of Lilly's evidentiary materials, except the portions of the

---

[1] All record citations refer to the document and page numbers assigned by the court's electronic filing system.

affidavit to be stricken, will be treated as true.

Charter hired Lilly as a Customer Care Supervisor on June 1, 2004.  (Doc. 29-1 at 10-11; Doc. 29-2 at 13.)  Lilly's good performance as a Charter employee is evidenced by her positive performance reviews and the promotions she received.  On September 6, 2006, she was promoted to Workforce Supervisor II, and on December 15, 2006, she was promoted to Workforce Manager II.  (Doc. 29-1 at 11; Doc. 29-2 at 13-14.)  Lilly worked in Charter's Vestavia Hills, Alabama office.  (Doc 29-2 at 15.)  Her yearly overall performance reviews reflect that from 2004 through 2006 she was rated as "exceeding expectations", the highest possible rating.  (Doc. 32-8 at 1-7.)  In 2007, Lilly was rated as "achieving expectations", a lower rating.  (*Id.* at 8-10.)  She routinely worked longer hours than required and was available to Charter at all hours.  (Doc. 29-1 at 36.)  None of the evidence suggests that Lilly was anything but a good employee.

In early 2007, Lilly began to suffer from work-related anxiety, after which she consulted a physician.  (Doc. 31 at 3; Doc. 29-1 at 25.)  She suffered from fibromyalgia, and experienced tremors and fatigue.  (Doc. 29-1 at 25.)  In September of 2007, Charter granted Lilly's request for two weeks of FMLA leave.  (*Id.* at 13-14.)  Nobody at Charter ever made any derogatory comments or negative references about Lilly's 2007 FMLA leave.  (*Id.*)  Lilly knows of no other employee who claims that Charter retaliated after

taking FMLA leave.  (*Id.* at 42.)

In early 2008, Charter, which thereafter filed for Chapter 11 bankruptcy (*see* Doc. 7), began implementing a restructuring plan to reduce its costs and increase efficiency (Doc. 29-5 at 1).  The restructuring plan resulted in the merging of Charter's Georgia and Alabama Key Market Areas ("KMAs") into a single KMA.  (*Id.*) Charter announced the restructuring plan to its employees on April 9, 2008, at which time Charter terminated all of the director-level personnel at the Vestavia Hills office.  (*Id.* at 2; Doc. 29-4 at 14.)  Lilly survived this round of terminations.  She thereupon discussed her future role as a Charter employee with her new supervisors, who made her no promises, but did not make dire predictions of further reductions.  (Doc. 32-1 at 3-4.)  Still, there was writing on the wall.

Around the time Charter was restructuring, Lilly's work-related stress, fatigue, and tremors worsened, and she scheduled an appointment with her doctor.  (Doc. 29-1 at 24.)  The possibility of losing a job might, of course, be more stressful than actually performing the job. Originally, Lilly's doctor's appointment was scheduled for April 10, 2008, but she had to reschedule to April 15, 2008, because she did not want to miss a scheduled conference call with the new manager of the Vestavia Hills office.  (Doc. 32-1 at 3.)  Lilly was caused to cancel the April 15, 2008 doctor's appointment because of a meeting scheduled on that date with Stacia

Edwards ("Edwards"), the Director of Technical Workforce Management for the newly consolidated KMAs. (Doc. 32-1 at 3-4.) At that meeting, according to Lilly, she told Edwards about her cancellation of the April 15, 2008 doctor's appointment, and that she was "contemplating taking leave due to some of my health problems, and would need to consider my Georgia trip when setting up a subsequent appointment". (*Id.* at 4.) Lilly made a new doctor's appointment for the morning of April 22, 2008, but did not inform Edwards of it. This appointment she kept. Her doctor recommended that she immediately take FMLA leave. (Doc. 29-1 at 24.) There is no evidence that Lilly told Edwards in advance of the precise date or time of her doctor's appointment, which might have been set to accommodate the trip to Georgia mentioned in the conversation with Edwards.

On April 16, 2008, unbeknownst to Lilly, Charter's H.R. Director for the East Division sent an email to relevant management personnel with an attached spreadsheet containing the names of forty-two employees in Georgia and Alabama who were to be terminated. (Doc. 29-5 at 7-9.) The list included Lilly and seven other Vestavia Hills employees. The email said that the named employees were to be terminated on April 23, 2008. (*Id.*) The email contained an addendum providing the names of four people to be removed from the termination list, but Lilly was not among them. (*Id.*)

On the morning of April 22, 2008, a day earlier than had been indicated by the April 16 email, of which the employees to be terminated were unaware, Charter terminated twenty-five employees in Georgia and Alabama, including seven out of the eight Vestavia Hills employees slated for termination.  (Doc. 29-5 at 4.) Charter's Paige Wilder ("Wilder"), conducted the exit interviews at the Vestavia Hills office while Lilly was at her doctor's appointment.  (*Id.* at 4-5.)  There is nothing to suggest that if Lilly had attended the termination meeting she would not have been terminated along with the others.

After her April 22, 2008 doctor's appointment, Lilly drove to the Vestavia Hills office, arriving at ten o'clock.  (Doc. 29-1 at 25-26.)  Upon arrival, Lilly went straight to the office of Michelle Thomas ("Thomas"), a Charter Human Resource ("HR") associate, and requested FMLA leave.  (Id. at 26.)  Thomas told Lilly to wait in the lobby, saying that she would be "right back". (*Id.*)  Although Lilly did not feel well, she waited in the lobby for at least an hour, and then returned to her office to wait. (*Id.* at 26-27.)

While Lilly was waiting, Thomas reported Lilly's FMLA leave request to Wilder and to Colleen Judson ("Judson"), Charter's Vice President of HR.  (Doc. 29-5 at 4-5.)  Concerned about Lilly's FMLA request under the circumstances, Wilder and Judson consulted with another HR representative about how to handle the situation.  (*Id.*)

5

After deciding to proceed with termination as already planned, Lilly was told by Wilder and Thomas that the FMLA leave request would be granted and that she would not be formally terminated until her FMLA leave expired. (*Id.* at 5; Doc. 29-1 at 27.) Wilder and Thomas further informed Lilly that, after her post-leave termination, she would receive the same severance package as originally planned. (Doc. 29-5 at 5.)

The day after Lilly was placed on FMLA leave, Charter cut off her access to the company's email and intranet. (Doc. 29-1 at 31.) Lilly contends that, during her employment, none of her subordinates who took extended leave had their intranet access interrupted. (*Id.*) This non-access concededly prevented Lilly from viewing internal job postings except to the extent they were also posted on Charter's publicly accessible website. (*Id.*) Charter maintains, without contradiction except by Lilly's bare assertions, that its standard policy is to discontinue intranet access for terminated employees and for those scheduled for extended leave with no expectation of returning to work. (Doc. 29-5 at 5-6.) Lilly's personal disbelief that such a policy exists does not prove its non-existence. If there is a legitimate factual dispute over the said policy, which there is not, the dispute is reduced to insignificance by that fact that Lilly has presented no separate claim that her non-access constituted an adverse employment decision actionable under the FMLA.

While on FMLA leave, Lilly was contacted by Gerald Tinsley ("Tinsley"), a Charter recruiter.  He informed her of an open position as a dispatch manager.  (Doc. 29-1 at 33.)  Edwards then called Lilly and scheduled an interview  (*Id.*)  Part of Lilly's earlier duties as a Workforce Manager II had involved managing dispatch, so the duties of the open position were virtually the same as duties she had previously performed.  (*Id.*; Doc. 32-1 at 3.)

Charter did not hire Lilly.  Instead, it internally promoted Brenda Gatson to the position.  (Doc. 32-1 at 1-3.)  Charter maintains that it hired Gatson, rather than Lilly, because Wilder and Edwards, after deliberation, concluded that "Gatson's skill set was the best fit for the position and she had a superior performance history with Charter."  (Doc. 29-5 at 5.)

During some unspecified period of time before Lilly's termination, Lilly had been Gatson's supervisor.  (Doc 32-1 at 1.) Lilly contends that Gatson was criticized by Charter managers and co-workers for a variety of performance problems, and that on three occasions Lilly was forced to address Gatson's inappropriate attire.  (Doc. 32-1 at 2.)  Gatson had never requested FMLA leave. (*Id.* at 3.)  Gatson's personnel file is not in the record.  For aught appearing, the Charter records would show Gatson to be a good employee worthy of promotion, despite Lilly's adverse evaluation of her.

**DISCUSSION**

**Charter's Motion to Strike**

Rule 56 F.R.Civ.P. was amended on December 1, 2010. When rules of procedure are amended, the amended rule generally governs pending proceedings after the date of amendment, unless "[t]he court in which the action is pending determines that applying the rule would not be feasible or would work an injustice in that action. . . . In such a case, the former rule applies." 8 JAMES WM. MOORE, ET AL., MOORE'S FEDERAL PRACTICE ¶ 41.50[7][A](3d ed. 2010).

Charter filed its motion for summary judgment on October 29, 2010. Lilly responded on November 19, 2010. (Doc. 32.) Lilly's response included the affidavit that is the subject of Charter's motion to strike. While Charter's motion did not come under submission until December 3, 2010, two days after amended Rule 56 took effect, the motion and Lilly's allegedly objectionable evidentiary material were both filed before December 1, 2010. Under these circumstances, it would be infeasible and unfair to apply the new rule. Rule 56 as it existed prior to December 1, 2010, will be applied both to the motion for summary judgment and to the attendant motion to strike.

The pre-December 2, 2010 version of Rule 56(e)(1) provides:

> A supporting or opposing affidavit must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated. If a paper or part of a paper is referred to in an affidavit, a sworn or

certified copy must be attached to or served
with the affidavit.  The court may permit an
affidavit to be supplemented or opposed by
depositions, answers to interrogatories, or
additional affidavits.

Rule 56(e)(1) F.R.Civ.P.

Charter moves to strike portions of Lilly's affidavit (Doc.
32-1) on the following grounds: (1) lack of personal knowledge; (2)
hearsay; (3) failure to attach referenced documents; and (4)
failure to identify a person with discoverable information.  The
portions of Lilly's affidavit to which Charter objects are
hereinafter addressed in turn.

In paragraph four of Lilly's affidavit, she says:

Prior to, during, and after my supervision of
Ms. Gatson, she was criticized frequently by
other Charter managers for her inability to
effectively communicate with others, and for
her poor interpersonal skills, particularly
toward her subordinates.  Ms. Gatson was
repeatedly involved in conflicts with her
subordinates, and cited by Charter mangers
[sic] for her lack of leadership skills.
These problems were known to Penny Harris-
Johnston and Greg Prim, my supervisors at
Charter.

(Doc. 32-1 at 2.)  Charter moves to strike the entire said
paragraph as inadmissible hearsay and because Lilly lacks personal
knowledge of what it contains.  (Doc. 34 at 3, 6-7.)  Hearsay that
cannot be reduced to an admissible form at trial cannot be used to
defeat a motion for summary judgment.  *See Pritchard v. S. Co.
Serv.,* 92 F.3d 1130, 1135, *amended in part on rehearing,* 102 F.3d
1118 (11th Cir. 1996), *cert. denied,* 520 U.S. 1274 (1997); *Wyant v.*

*Burlington Northern Santa Fe R.R.,* 210 F. Supp. 2d 1263, 1275-76 (N.D. Ala. 2002). However, an affidavit that contains hearsay may be submitted in connection with a motion for summary judgment if the hearsay would be admissible at trial under some exception to the hearsay rule. *Wyant,* 210 F. Supp. 2d at 1276 (citing *H. Sand & Co. v. Airtemp Corp.,* 934 F.2d 450, 454-55 (2nd Cir. 1991). Charter asserts that this paragraph is offered for its truth, and the court agrees. If it were intended only to identify potential witnesses, there are other procedural devices for accomplishing that purpose.

Lilly not only lacked personal knowledge, but she purports to speak about events that took place after she was no longer Gatson's supervisor, and even after her own employment ended. Charter argues that the entire statement should be stricken. Charter properly points out, time and time again, that Lilly could not know, except by hearsay, that other supervisors were or were not aware of other employees' criticisms of Gatson.

Lilly's affidavit asserts that all of the statements are based on her personal knowledge. **Declaring it** does not make it so. "According to the Federal Rules of Evidence, personal knowledge can be established by showing that the witness was in a physical position to see, hear, or otherwise perceive the matters to which the testimony relates." *Johnson v. Scotty's, Inc.,* 119 F. Supp. 2d 1276, 1281 (M.D. Fla. 2000) (citing Rule 602, F.R.Evid.). While

10

employed as a supervisor over Gatson, Lilly was in a position to observe Gatson's performance and her co-workers' and supervisors' reactions to it.  However, Lilly has not laid the factual predicate to demonstrate a basis, other than hearsay, for an evaluation of Gatson's performance after she was no longer Gatson's supervisor, and there is no evidence as to the dates upon which Lilly's supervisory responsibility started or ended.   All portions of paragraph four, except for Lilly's criticisms of Gatson's performance from her own observation, will be stricken.

Paragraph five of Lilly's affidavit states:

> On at least three separate occasions, I was required to address Ms. Gatson's personal attire.  As part of an employee survey, one of Ms. Gatson's direct reports noted that Ms. Gatson "looks like she just got off the night shift at the rodeo bar."   There was substantial negative feedback about Ms. Gatson in her employee surveys, which I saw.

(Doc. 32-1 at 2.)  Charter moves to strike paragraph five on the grounds that it is hearsay and is based on documents not attached or otherwise in evidence.  Rule 56 requires that "[i]f a paper or part of a paper is referred to in an affidavit, a sworn or certified copy **must** be attached to or served with the affidavit." Rule 56(e)(1) (emphasis added).  Because the "employee survey" and the "direct reports" referenced in paragraph five are not in evidence, all of paragraph five, except the first sentence thereof, which was based on personal observation, will be stricken. Although a strict application of Rule 56 would call for striking

11

the entire affidavit because of the absence of the documents, Charter has not asked for such a Draconian measure, and if it had, the court would not have granted it.

Paragraph six of Lilly's affidavit states:

> Prior to the time I became Ms. Gatson's supervisor, Ms. Gatson was accused of soliciting drugs from one of her subordinates. She was required by Charter to undergo a drug test. Though she passed the drug test, several of her direct reports noted that she had, in fact, engaged in the conduct she was accused of.

(Doc. 32-1 at 2.)   Charter objects to paragraph six, contending that Lilly lacks personal knowledge, and that the statement is hearsay.   Charter is correct.   Paragraph six will be stricken as classic hearsay.

Paragraph seven of Lilly's affidavit states:

> In contrast to Ms. Gatson, I always received excellent evaluations, and was never criticized for any of the performance problems or lack of skill for which Ms. Gatson was criticized.

(Doc. 32-1 at 2-3.)   Charter argues that paragraph seven should be stricken under the sham affidavit theory because Lilly testified in her deposition that her 2007 evaluation rated her overall performance as "meets expectations". (Doc. 29-1 at 14.)   Charter's performance evaluations have three categories: "exceeds expectations"; "meets expectations"; and "does not meet expectations". (*Id.*)   The performance evaluations referred to by Lilly in her affidavit reflect that from 2004 through 2006, her

12

yearly overall performance was rated as "exceeding expectations". In 2007, her performance was rated as "meets expectations". (Doc. 32-8.)  The Eleventh Circuit holds:

> When a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely **contradicts**, without explanation, previously given clear testimony.

*Reese v. Herbert,* 527 F.3d 1253, 1270 n.28 (11th Cir. 2008) (emphasis added)(quoting *Van T. Junkins and Assoc., Inc. V. U.S. Indus., Inc.,* 735 F.2d 656, 657 (11th Cir. 1984)).

Nestled among the more stellar synonyms for "excellent" are "competent", "meritorious", "preferable", and "proficient". WILLIAM C. BURTON, LEGAL THESAURUS 699 (Stephen C. DeCosta, ed.)(1980).  "Meets expectations" suggests to the court that the referenced employee is deemed competent by the employer.  **Charter has never contended otherwise**.  Lilly's deposition description of her evaluations as "excellent" is not materially contradicted by her 2007 "meets expectations" evaluation.  Charter's motion to strike paragraph seven will be denied.

In paragraph twelve of her affidavit, Lilly declares:

> At the same April 15 meeting, I informed Ms. Edwards that I had cancelled an appointment with a physician.  I informed her that I was contemplating taking leave due to some of my health problems, and would need to consider my Georgia trip when setting up a subsequent appointment.

(Doc. 32-1 at 4.)   Charter argues that paragraph twelve should be stricken because Lilly's initial disclosures did not identify Edwards as a person with discoverable information, and that Lilly did not mention the conversation with Edwards when asked about it during her deposition.

Rule 37 provides in part:

> If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion , at a hearing, or at a trial, unless the failure was substantially justified or is harmless.

Rule 37(c)(1) F.R.Civ.P.   Rule 26 provides that a party must supplement or correct initial disclosures "if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." Rule 26(e)(1)(A) F.R.Civ.P.   There has been no such supplement by Lilly.

Although Lilly's formal disclosures have not identified Edwards as a person with discoverable information, Charter itself acknowledged Edwards as a witness in response to Lilly's first interrogatories.   (Doc. 35-1.)   During her deposition, Lilly discussed Edwards's involvement with her hiring, termination, and interview process multiple times.   (Doc. 29-1.)   The fact that Edwards had discoverable information was well known to Charter. Lilly's failure to disclose was harmless.   Charter's motion to

strike paragraph twelve will be denied.

In paragraph fourteen of her affidavit, Lilly declares:

> In addition to Ms. Edwards having knowledge of my medical problems and my desire to take protected leave, Greg Prim, my supervisor, was also aware that I was planning to see a physician about the possibility of taking FMLA leave.

(Doc. 32-1 at 4.)  Charter argues that his paragraph is not based on Lilly's personal knowledge.  Lilly has not laid a foundation for how she could have acquired knowledge of Greg Prim's alleged awareness of Lilly's plan to take FMLA leave, except by hearsay. Accordingly, Charter's motion to strike part of paragraph fourteen, including the word **"protected"**, which is conclusory, will be granted.

In paragraph fifteen of her affidavit, Lilly declares:

> After I was informed that I would be terminated when I returned from FMLA leave on April 22, 2008, my access to Charter email and the Charter intranet was cut off.  This was not done for other Charter employees who had taken FMLA leave.  For instance, at least two employees who reported directly to one of my own subordinates were on FMLA leave, yet communicated to us through Charter email on a regular basis.

(Doc. 32-1 at 4-5.)  Charter moves to strike this paragraph because the documents to which it refers are not attached.  Not only are the emails themselves the best evidence of what they contain, but Lilly does not provide any basis for personal knowledge, except from her own recollection of what the absent documents contained.

15

She obviously got her information either from hearsay or from documents not in evidence. All but the first sentence of paragraph fifteen will be stricken.

**Conclusion on Motion to Strike**

Consistent with the preceding discussion, Charter's motion to strike will be granted in part and denied in part. The court need not venture to say what, if any, effect the elimination of the objectionable portions of Lilly's affidavit would have had on this court's ultimate conclusion.

**Charter's Motion for Summary Judgment**

**Retaliatory Termination**

In an FMLA retaliation claim based entirely upon circumstantial evidence, as in this instance, the court applies the burden shifting analysis established by *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 798 (1973). *E.g. Brungart v. Bellsouth Telecomms., Inc.,* 231 F.3d 791 (11th Cir. 2000). To make out a *prima facie* case, Lilly must demonstrate that: (1) she engaged in statutorily protected activity; (2) she suffered an adverse employment action; and (3) a causal connection between the activity and the adverse action. *Id.*; *Martin v. Brevard Cnty. Pub. Schs.,* 543 F.3d 1261, 1268 (11th Cir. 2008). The third requirement, causation, is the only disputed element.

Generally, close temporal proximity between an employee's protected act and the adverse employment action satisfies the

16

causation element.  *Brungart,* 231 F.3d at 799.  However:

> In a retaliation case, when an employer
> **contemplates** an adverse employment action
> before an employee engages in protected
> activity, temporal proximity between the
> protected activity and the subsequent adverse
> employment action does not suffice to show
> causation.

*Drago v. Jennes,* 453 F.3d 1301, 1308 (11th Cir. 2008) (emphasis added) (affirming district court's grant of employer's motion for summary judgment).

On April 22, 2008, Charter informed Lilly that she was being terminated after her FMLA leave.  She got this bad news a short time after she requested FMLA leave.  However, by April 16, 2008, Charter had actually "**contemplated**" firing Lilly as part of its restructuring operation.  In fact, her name had appeared on the spreadsheet listing Charter employees to be terminated.  Aside from the four employees specified in the April 16, 2008 email attachment as de-listed, there were no exceptions or changes of mind by Charter after April 16, except to accommodate Lilly's request for FMLA leave.  Accordingly, under *Drago,* Lilly cannot establish causation via temporal proximity alone because the wheels of termination were already grinding on April 16, 2008. Lilly's belated request for FMLA leave did not change that fact. Put in a hackneyed way, "the train had left the station".  As Charter rightly argues, an effect cannot precede its cause.

Lilly contends that her April 15, 2008 conversation with

17

Edwards (mentioned for the first time in Lilly's affidavit filed in opposition to the Rule 56 motion) constituted notice to Charter of Lilly's intent to make an FMLA leave request.  An FMLA request must be fully comprehensible by the employer in order to be effectual.  The employer cannot be called upon to speculate or to guess about it.  During the conversation of April 15, 2008, Lilly "informed Ms. Edwards that I had cancelled an appointment with a physician. I informed Ms. Edwards that I was contemplating taking leave due to some of my health problems and **would need to consider my Georgia trip when setting up a subsequent appointment.**" (emphasis added).  (Doc. 32-1 at 4).  Lilly's statement to Edwards that she was experiencing health problems and was thinking about taking leave did not amount to a request for leave.  Lilly did not actually request FMLA leave until April 22, 2008, six days after the April 16 email unequivocally named Lilly as an employee to be terminated.  A downsizing decision cannot be circumvented, either accidentally or on purpose, by requesting FMLA leave just before the decision is revealed.

Lilly challenges Charter's proposed evidentiary impact of the April 16, 2008 email.  The email specifies that listed employees, including Lilly, were to be terminated on April 23.  The employees were actually terminated a day early, on April 22, 2008, but there is no evidence to suggest that the date change was designed to head off Lilly or to disadvantage her.  Lilly argues that the discrepancy

18

in dates indicates that the termination list was not final, and that Lilly's subsequent FMLA leave request was the real reason for her continuation on the list.  Lilly argues that the addendum contained in the same April 16, 2008 email, ordering the removal of four names from the list, indicates that the list was not final.  However, the undisputed evidence is that the terminations actually did take place, including all of Lilly's seven coworkers listed for termination.  Any discrepancy between the planned and actual date of termination is innocuous, and not enough to create a jury triable issue.  Similarly, regardless of the fact that the April 16, 2008 email identified four employees to be removed from the termination list, Charter clearly planned to terminate **Lilly**, by name, prior to her FMLA leave request.  The fact that Lilly affirmed under penalty of perjury in paragraph twelve that she told Edwards abut a trip to Georgia, which would have been a good reason for rescheduling her doctor's appointment, goes a long way to contradict Lilly's hopeful conclusion that the day-early terminations were to disadvantage her. For aught appearing to Charter, Lilly was in Georgia on April 22, 2008.  Furthermore, there is nothing to suggest, much less to prove, that on April 23, 2008, Charter would have done anything different from what it did on April 22, 2008.  Lilly simply does not demonstrate a causal connection between her request for FMLA leave and her termination.

Assuming, *arguendo*, that Lilly has established her *prima facie*

case, her claim would still fail under the *McDonnell Douglas* burden shifting analysis, because Charter's restructuring provided a perfectly legitimate reason for terminating Lilly, and Lilly has not demonstrated that Lilly's articulated explanation was pretextual. In today's world it is not surprising that under these peculiar circumstances Charter's decision-makers vis-a-vis Lilly would consult with H.R. before informing Lilly of her termination. What Charter did was a justifiable compromise with Lilly, whether made on April 22, as it was, or on April 23, when it was initially scheduled. The way Charter handled it cannot fairly be construed as an admission against interest. Would Charter have been better off forensically if it had refused Lilly FMLA leave? This is a hypothetical question without an answer.

### Retaliatory Refusal to Rehire

Lilly next contends that Charter's refusal to hire her as a dispatch manager after her termination was in retaliation for her having taken FMLA leave. The elements of Lilly's *prima facie* case under this theory are the same as the elements needed to prove her retaliatory termination claim. Again, causation is the only disputed requirement. Because Lilly was still on FMLA leave when she was interviewed and not hired, she satisfies her *prima facie* case via temporal proximity. *See, e.g., Martin v. Brevard County Public Schools,* 543 F.3d at 1268 (11th Cir. 2008).

As in the claim of wrongful discharge, the burden shifts to

Charter to proffer a legitimate, non-retaliatory reason for hiring
Gatson instead of Lilly. *E.g. Brungart,* 231 F.3d at 798. The
intermediate burden is met where:

> [t]he employer articulates lawful reasons for
> the action; that is, to satisfy this
> intermediate burden, the employer need only
> produce admissible evidence which would allow
> the trier of fact rationally to conclude that
> the employment decision had not been motivated
> by discriminatory animus.

*Texas Dept. Of Community Affairs v. Burdine,* 450 U.S. 248, 257 (U.S.
1981) (vacating and remanding appellate court's reversal of district
court's verdict for employer where appellate court "placed on the
defendant the burden of persuading the court that it had convincing,
objective reasons for preferring the chosen applicant above the
plaintiff") *id.* "[T]he employer's burden is satisfied if he simply
explains what he has done or produces evidence of legitimate
nondiscriminatory reasons." *Bd. of Trs. of Keene State Coll. v.
Sweeney,* 439 U.S. 24, 25 n.2 (1978)(*per curiam*)(internal quotations
and punctuation omitted).

Charter offers a satisfactory and understandable reason for
hiring Gatson instead of Lilly. In Wilder's affidavit she says:
"Gatson's skill set was the best fit for the position, and she had
a superior performance history with Charter." (Doc. 29-5 at 5.)
A provocative question would have been presented if Charter's
proffered reason for preferring Gatson was that Lilly's proven
history of inability to tolerate stress would prevent her from

adequately performing the stressful job of a dispatcher, a job quite similar to her former job.  The court is happy that such an issue has not been presented, although this opinion would have been longer, if not different in other respects.  Having satisfied its light intermediate burden, the burden shifts to Lilly to prove that Charter's proffered reason is pretext.

To demonstrate pretext, Lilly must show "*both* that the reason was false, *and* that discrimination [retaliation] was the real reason".  *Brooks v. Cnty. Comm'n of Jefferson Cnty, Ala.,* 446 F.3d 1160, 1163 (11th Cir. 2006)(quoting *St. Mary's Ctr. v. Hicks,* 509 U.S. 502, 515 (U.S. 1993)(emphasis in original).  The only employee evaluations before the court are Lilly's own recollections and opinions.  Gatson's performance reviews are nowhere to be found, unless by the favorable implications inherent in Wilder's affidavit, and by Lilly's unfavorable opinions of Gatson.  Admittedly, there evidence upon which a jury could find that Lilly was better qualified than Gatson.  For instance, Lilly had previously performed the job duties of a dispatch manager, while Gatson had not.  It is, however, Lilly who touts her qualifications for the open position as superior.  If there has been a reported retaliation case decided by a court against an employer based only on the plaintiff's self-evaluations of herself and of her competitor, this court has not found it.  However, whether a jury could reasonably conclude that Lilly was better qualified than Gatson is not the issue.  *Brooks,*

446 F.3d at 1164.  The issue is whether "the disparities between the successful applicant's and her own qualifications were 'of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff.'" *Id.* at 1163 (quoting *Cooper v. S. Co.,* 390 F.3d 695, 732 (11th Cir. 2004)).  Lilly has not met this substantial burden.  She, of course, has a right to her opinion of herself and of a fellow employee about whom she has personal knowledge.  But, so does her employer.  A reasonable person could reasonably conclude, as Charter did, that Gatson had a "better skill set" than Lilly.  Managerial judgment cannot be judicially gainsaid unless the complaining employee is so obviously superior to the chosen one as to be shocking, overwhelming or indisputably wrong.  There is no such evidence here.  Charter went out of its way to accommodate Lilly when it invited her to interview for an open position.  It did not have to do so.  If Charter had not reached out to Lilly, as it did, it would not be defending a claim for failure to hire.  To use another trite phrase: "No good deed should go unpunished."

### CONCLUSION

For the reasons above-stated, Charter's motion to strike will be granted in part and denied in part.  Charter's motion for summary judgment will be granted.  Separate orders effectuating this opinion will be entered.

DONE this 7th day of March, 2011.

WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT JUDGE